60 P.(2d) 203

**ELLIOTT v. GENTRY.***

No. 4128.

Supreme Court of New Mexico.

Aug. 11, 1936.

Lake J. Frazier and L. O. Fullen, both of Roswell, for appellant.

Askren, Watson & Hanny, of Roswell, for appellee.

BICKLEY, Justice.

Elliott being the owner of lands, sued to evict Gentry, his tenant, from the possession thereof, and prevailed. Gentry appealed. During the existence of the rela-tion, Elliott and Gentry signed a cotton acreage reduction contract with the secretary of agriculture, covering the Elliott farm. This contract is primarily between the owner Elliott, referred to therein as the "producer" and the secretary of agriculture. It covers 1934 and also 1935 at the option of the secretary. A certain acreage representing the reduced acreage ordinarily planted to cotton is thereby *rented* to the secretary. It is therein said: "The acres hereby rented to the Secretary are referred to hereinafter as 'the rent-ed acres.'"

One of the covenants of performance by the owner producer is: "5. Use the rent-ed acres only for: Soil-improving crops; erosion-preventing crops; food crops for consumption by the producer on this farm; feed crops for the production of livestock or livestock products for consumption or use by the producer on this farm; or fal-lowing; or such other uses as may be permitted by the Secretary or his author-ized agent."

The contract is illumined with notes among which are: "3. Managing share-tenants, as defined in note 7, page 3, may join with the owners in signing contracts as provided by paragraph 12."

Note 7 is as follows: "7. A managing share-tenant is a share-tenant who fur-nishes the work-stock, equipment, and labor used in the production of cotton and who manages the operation of this farm."

Among the requirements for perform-ance by the secretary is paragraph 10

which provides for rental payments on the acres "rented to the Secretary."

A portion of paragraph 13 is as follows:

"* * *

(The following form of signature is to be used where Paragraph 12 applies)

"Witness:  Virgil M. Grantham
(Signature)

"Witness:  Virgil M. Grantham
(Signature)

Robert W. Elliott, as owner.
(Signature)

Thomas B. Gentry ⎰producer who
(Signature)    ⎱is a managing
          share-tenant.

"Date, Jan. 30, 1934."

As paragraph 12 is the one which brings in Gentry, as a "share-tenant," we quote it:

"12. In the event that this farm is operated by a managing share-tenant, 7 said tenant shall sign this contract with the owner or his legally authorized agent who must submit his authority to act, and each installment of the rental payments due under this contract shall be divided as follows:

"Fifty percent (50%) to Robert W. Elliott R. 2, Bx. 57, Roswell, N. M., as owner.
(Name)          (Address)

"Fifty percent (50%) to Thomas B. Gentry, Exter, N. M. ⎰producer who
(Name)          (Address)     ⎱is a managing
                    share-tenant,

and the parity payments due under this contract shall be divided according to their respective interests in the crop: 25 percent to Robert W. Elliott R. 2, Bx. 57,
(Name)          (Address)
Roswell, N. M., as owner, 75 percent to Thomas B. Gentry, Dexter, N. M. ⎰producer who
(Name)          (Address)     ⎱is a managing
                    share-tenant,

and separate checks shall be issued to the owner and, subject to paragraph 10, to the producer."

The following is taken from appellee Elliott's statement of facts:

"About the middle of October, 1934, Elliott told Gentry that he, Elliott, would want the place for 1935, and Gentry acquiesced. Thereafter, with Gentry's knowledge and consent, Elliott went upon the place and did some work to prepare the farm for the planting of crops for 1935, and repaired the wells, irrigated some of the land, and did some plowing. At about that time, Gentry told Elliott to move on down to the farm, that Elliott could have one of the houses and move down. This was in the latter part of 1934.

"Several persons testified in substance that Gentry had stated to them that he 'was going to get off the place', that 'Elliott was going to farm it himself the next year' (1935), and that he, Gentry, 'was looking for a place'. According to some of the plaintiff's witnesses, these state-

ments were first made in the latter part of October or early part of November of 1934. Appellant testified that according to his best recollection, Elliott first mentioned that he wanted the place for 1935 along about the middle of December, 1934.

"The uncontradicted evidence of both parties was that Gentry said he was going to move, and that Gentry was apparently trying to get another place and spoke to several people about it; and that Gentry never said nor intimated that he was not going to move off the place until after the first of the year 1935, and just prior to the time the complaint was filed. At that time Gentry asked Elliott if he, Gentry, could not have half of the place to farm for that year, and Elliott replied that he had made other arrangements; then, when Elliott started to resume his plowing on the place, Gentry sent word by one of his sons to Elliott for him not to plow. At this time one of the Gentry boys was doing some work putting in ditches, and when Elliott asked what he was doing the son said, 'Papa told me to put them in.' (Tr.pg. 56). After this incident, Elliott filed his suit in ejectment."

Appellant criticizes this statement of facts, claiming that the evidence shows that Gentry never agreed unconditionally to surrender the farm, always qualifying his statement that he would do so by saying, "if" he could get another place, or "if" Elliott would find him a place to move to. Elliott did not find another place for Gentry and Gentry did not find

one for himself and he remained in possession of the Elliott farm which continued possession gave rise to Elliott's suit in ejectment. Gentry also challenges the stated conclusion that he acquiesced to Elliott's demand for possession for 1935. Elliott's complaint alleges: "2. That the defendant on the 2nd day of January, 1935, entered into such premises and unlawfully withheld, and still unlawfully withholds, from the plaintiff the possession thereof."

Since there is no evidence of a new and independent entry into the premises by Gentry on January 2, 1935, we assume that there is no claim that Gentry had ever during the tenancy surrendered possession and re-entered on January 2, 1935.

■ Plaintiff Elliott also filed a motion stating that Gentry unlawfully withheld possession of his farm under an alleged oral lease which expired January 31, 1934; that plaintiff desired to farm and cultivate the farm and use and occupy the same during the year 1935 and that defendant refused to vacate said premises; that plaintiff feared that defendant would attempt to obtain some claim of right or rights during the pendency of the suit by farming and cultivating the land, or otherwise, and prayed an order to show cause against said defendant Gentry and that he be restrained and enjoined during the pendency of the suit from cultivating the premises. Gentry filed his answer denying the allegations of the complaint and also filed his answer to the order to show cause alleging that he was entitled to the possession of the land, by reason of the writ-

ten contract which he and Elliott had entered into with the secretary of agriculture. We do not agree with appellant in so far as he contends that the relation of landlord and tenant between the parties was created by the written contract. As we view it, the written contract between the landlord and tenant on one side and the secretary of agriculture on the other, presupposed the existence of landlord and tenant relation between them for the years 1934 and 1935 and in view of the fact that Elliott had rented the place to Gentry by written lease for the year 1931 and that Gentry had held over after the expiration of that lease during the years 1932, and 1933, we think it a reasonable supposition. The written contract with the secretary did not create the relation of landlord and tenant, but was strong evidence of the prior existence of such relation.

The trial court after hearing the cause, announced as follows:

"Gentlemen, I don't think the proof will justify a finding this defendant is a menace or a nuisance, and it comes down to the question of the surrender of these premises by the defendant to the plaintiff. I don't think the testimony is sufficient to hold this man is a menace or a nuisance to the place. Now, it seems to me it is a question of whether the voluntary surrender, if you have any administration rulings on this, that it does not apply to a man like this, an ordinary tenant who holds for two years, unless he becomes a menace to the place * * *

"I will check up on the testimony a little of these other witnesses on the line of what happened about the surrender of that place. I will make the announcement in it later. I want to go over some of the testimony with the reporter."

Later the trial judge filed his memorandum, reading as follows: "In the case of Elliott v. Gentry, I have concluded that Gentry voluntarily surrendered his rights to the farm for this year. The plaintiff in reliance upon such surrender, went to work on the place, preparing it for the planting of crops for this year. A judgment may be drawn in accordance with this view, presented to the attorneys for defendants, and then submitted to the court for signature."

Thereafter, on February 15, 1935, the court entered its judgment finding that the plaintiff was entitled to have possession of the land; that he was the owner of the premises; that at the commencement of the action the defendant was in possession of the premises and that the said defendant surrendered any rights he may have had under the contract between the parties and that he should be enjoined from interfering with the possession of the plaintiff.

Was the decision of the trial court that Gentry had surrendered his estate arising from the tenancy correct? We think not.

"A surrender is a yielding up of an estate for life or years, to him who hath the immediate estate in reversion or re-

mainder, wherein the estate for life or years, may drown by mutual agreement." Tiffany on Landlord & Tenant, § 187; Jones on Landlord & Tenant, § 538.

We need not consider surrender by instrument in writing for there was none. Arguendo, we give appellee the benefit of his contention that in this case no instrument in writing was necessary to effect a surrender. A surrender may also be accomplished by other means, as "by act and operation of law."

Perhaps oral words or indubitable acts of the tenant would accomplish a surrender. The evidence in the case at bar does not meet such a test.

The burden is on the party relying on a surrender of a lease to prove it, and where it is to be inferred from circumstances inconsistent with intention to perform, the proof must be clear. Norman Co. v. E. I. Du Pont, etc., Co., 12 Del. Ch. 155, 108 A. 743.

"To establish termination of such a tenancy by surrender in fact, the proof must be clear and unequivocal. An agreement to surrender, not executed, does not effect a surrender by operation of law." Rees v. Emmons Coal Min. Co., 88 W.Va. 4, 106 S.E. 247.

Appellee relies upon declarations made by appellant that he was willing to give up the place, and the testimony of witnesses that appellant was trying to secure another place. Appellant testified that he never agreed unconditionally to surrender his estate or the farm. He was willing to do so, he said, "if" he could find another place. Or "if" appellee Elliott would find a place for him to move to.

In this conflict of testimony it appears to us that a portion of appellee's own testimony as to the conversations supports appellant more than it supports appellee. We refer to that portion of the record reporting appellee Elliott's testimony as follows: " * * * he spoke to me, he says, 'If you can find anything,' he says, 'I will move any place. If I have got to move I will move any place I can get a place,' says, 'If you will find a place I wish you would.' "

Appellee relies upon the circumstance of his having gone to work on the place preparing it for planting of crops in 1935. The force of this is weakened because of the fact that the contract with the secretary recognized a right in the parties to use the "rented acres" for soil improving crops; erosion preventing crops; food crops, and feed crops for livestock, etc. As to these "rented acres," Gentry and Elliott were somewhat in the position of colandlords to the government, and the possession of such "rented acres" by both Gentry and Eliott would not be inconsistent with the dominion of Gentry generally over the farm as a whole.

The appellee alleged in his ejectment complaint that appellant was in possession of the farm and the court so found. The fact that appellant permitted Elliott to enter upon the property to cultivate the

"rented acres" in a manner permitted by the government is not inconsistent with appellant's possession of the farm as a whole and his claim of right thereto.

The testimony, viewed in a light most favorable to appellee, does not show a *present* yielding up of his estate; "if" he could find another place he would yield it up. It is asserted by some courts that a surrender cannot be made to take effect in futuro. On the other hand, it is asserted by writers of authority that a surrender may be made subject to a condition precedent, and a surrender subject to such a condition is necessarily, so long as the condition is unsatisfied, one to take effect in futuro.

The view that a surrender cannot be made to take place in futuro is presumably based on the theory that a surrender, in its very nature, implies a *present* yielding up of the particular estate. See Tiffany on Landlord & Tenant, § 189. There was no present yielding up of the estate. As we see it, there was plenty of conversation on the subject of terminating the lease, an expressed conditional willingness of one party to surrender and of the other party to accept a surrender at a future time, to wit, January 1, 1935, the conversations having occurred in the latter part of 1934. These conversations form nothing more than a parol executory agreement. A finding that these conversations accomplished a surrender is not justified in the absence of clear proof that the qualifying condition imposed came to

pass accompanied by clear proof of other acts showing that the offer to surrender was in fact executed. The most cogent proof would arise from a yielding up of possession of the premises contemporaneously with or shortly after the offer to yield up the tenant's leasehold estate. It may be that a written conveyance by way of surrender should operate to transfer the title irrespective of the grantor's retention of possession and we would not say that a *present* oral surrender, if clearly proved, might not accomplish the same purpose.

"A surrender of 'possession' is not always a surrender of a 'lease' or of the 'estate' thereby created. A surrender of possession, if accepted, is evidence from which a surrender of the estate may be inferred." McAdam on Landlord & Tenant, 5th Ed. § 319.

And we would almost say that where the claimed surrender rests in parol, and purports to be in futuro such a surrender of possession is essential to make out a case of surrender of the leasehold estate. As McAdams says at § 320: "A surrender in fact is made by express words, clearly manifesting the intention of the lessee to yield up his interest. To constitute an express surrender, no set form of words is necessary, nor is it required that there should be a formal re-delivery or cancellation of the lease; all that is requisite is the agreement and assent of the proper parties manifesting their intent, *followed by a yielding up of the possession to*

*him who hath the greater estate."* (Italics ours.)

The idea that an agreement manifesting an intent to surrender must be followed by a yielding up of possession by the tenant in order to accomplish a surrender in fact, finds support in many judicial expressions, a few of which we cite as illustrative

In Burnham v. O'Grady, 90 Wis. 461, 63 N.W. 1049, 1050, the ·Supreme Court ·of Wisconsin decided that there can be no surrender by operation of law of a lease for a term exceeding one year while the ·tenant retains possession, as tenant, of the leased premises or any material portion thereof, and said: "On the other hand, it seems manifest that the first essential and fundamental fact which must be present to constitute a surrender by operation of law from the acts of the parties is the surrender by the tenant of the leased premises."

▉ Where there is no yielding up by the tenant of possession, it would seem that there should be a showing of a consideration passing from the surrenderee to the surrenderer in order to support the claimed agreement to surrender. See Powell v. Jones, 50 Ind.App. 493, 98 N.E. page 646.

▉ As the agreement to surrender (if such agreement existed) remained executory, then, as a matter of law, appellant could revoke it, and apparently he did revoke it by failing and refusing to yield up possession. In the article on Landlord & Tenant in 16 R.C.L. § 672, discussing the general principles of surrender, it is said: "A mere agreement for a surrender where not actually executed does not operate as a surrender by operation of law. There can be no such surrender unless, in addition to the offer or tender of surrender, there is an abandonment of the property by the lessee and a resumption of the possession by the lessor, or such a vacation and relinquishment of the property by the lessee as will justify a resumption of the actual possession by the lessor. Where the lessee continues to occupy the premises and hold the possession, there is no surrender thereof, and the mere tender of the keys, or the offer to turn over the possession, will not so operate."

To the same effect is a statement in Thompson on Real Property, § 1462: "It is well settled American law that an agreement for the tenant to abandon possession and for the landlord to resume his occupancy, when acted upon by the parties, amounts in law to a surrender of the term. As long as such an agreement is executory, the landlord's offer to accept a surrender may be revoked and the tenant would continue bound for the full term * * * and a parol agreement is not effectual to terminate a lease till it has been acted upon by the transfer of possession to the landlord."

The following statement is made in 35 C.J. § 267: "The surrender may be conditional, to take effect in futuro, but a mere agreement for a surrender where not executed does not operate as a surrender."

In note 64 to the foregoing text, it is said: "There must ordinarily be an actual giving up of the lands to the landlord or other person for him." People's Express, Inc., v. Quinn, 235 Mass. 156, 126 N.E. 423; Fish v. Thompson, 129 Mich. 313, 88 N.W. 896.

In the Michigan case it was decided: "An agreement by a tenant to surrender at some time in the future, * * * does not, if broken, give the landlord the right to enforce the agreement by summary proceedings. He must resort to his action for damages."

At section 288 of the C.J. text on Landlord & Tenant, it is said: "A surrender of a part of the leased premises does not terminate the lease as to the remainder."

In § 274 of the said C.J. text, it is said: "A surrender cannot be implied by operation of law when the tenant still retains possession, as tenant, of the leased premises, or any material portion of them."

In Rees v. Emmons Coal Mining Co., 88 W.Va. 4, 106 S.E. 247, 251, the Supreme Court of Appeals of West Virginia held as follows: "Nor was it terminated by surrender. While the evidence is conflicting as to what was said October 12, 1917, about cessation of mining, that of the plaintiffs is indefinite. It does not say the tenant offered to surrender its term, and the offer was accepted. The purport of it is that there was a verbal notice to quit, acquiesced in by the defendant, and that the plaintiffs did not rely upon that alone. They deemed it advisable to give a written notice and did. Moreover, they were not dealing with the tenancy as one from year to year. They regarded it as a tenancy at will, wherefore they could not have treated the transaction as a surrender of a tenancy for a year. The law of surrender by agreement is strict. To comply with it, there must *be an actual surrender in præsenti. An agreement to surrender does not effect it.* National Union Bldg. Ass'n v. Brewer, 41 Ill.App. 223; Donahoe v. Rich, 2 Ind.App. 540, 28 N.E. 1001. This conversation occurred in Philadelphia, and the mining was then going on in West Virginia. *If there was a mere agreement to quit three days later,* as seems to have been the case, *there was no surrender in fact.* Of course, *there was none by operation of law, for the defendant never vacated* the mine nor ceased to operate it." (Italics ours.)

From all of the foregoing, it appears to us that there was no surrender of the lease by appellant, and therefore the judgment of the district court must be reversed, and the cause remanded, with directions to dismiss the complaint, and it is so ordered.

SADLER, C. J., and HUDSPETH and ZINN, JJ., concur.

BRICE, J., did not participate.